**In re Anthony C. TROMBETTA, Debtor.**

No. 03–34030.

United States Bankruptcy Court, S.D. Illinois.

Jan. 4, 2008.

James Haller, William A. Mueller, Mueller Associates, Belleville, IL, Mark Hunt, Mueller Associates, Glen Carbon, IL, for Debtor.

## OPINION

KENNETH J. MEYERS, Bankruptcy Judge.

This case presents the issue of whether the priority, unsecured creditors of a chapter 13 debtor are entitled to benefit from the increase in estate value realized when encumbered property is released from a lien through an avoidance action, or whether the value recovered through the lien avoidance action is required to be distributed solely to a debtor's general, unsecured creditors. The chapter 13 trustee in this case objects to plan modification on the basis that this Court's decision in *McRoberts v. Transouth Financial (In re Bell)*, 194 B.R. 192 (Bankr.S.D.Ill.1996), mandates that all recovered value must be directed to the exclusive benefit of the general unsecured creditors even when priority unsecured creditors have not been paid 100 percent of their allowed claims.

The debtor takes the countervailing position that the priority unsecured claims must be paid in full before the general unsecured creditors may receive any distribution as a result of the recovered value. As a corollary argument, the debtor contends that the "best interests of creditors test" found in 11 U.S.C. § 1325(a)(4) applies when a chapter 13 plan is modified following lien avoidance and caps the amount that the debtor is required to pay to fund the plan. The trustee takes the position that liquidation analysis is irrelevant to the issue at hand because the *Bell* decision demands that the recovered value be paid entirely to the general, unsecured creditors, with the plan base increased proportionately.

The following facts are not in dispute. The debtor filed a petition for relief under chapter 13 of the Bankruptcy Code on September 29, 2003. On February 9, 2004, the chapter 13 trustee in this case, using his powers under 11 U.S.C. § 544(a)(1), avoided the lien of General Motors Acceptance Corporation (GMAC) on the debtor's 2001 Chevrolet Cavalier, releasing previously encumbered value of $5,700.00. The debtor continued to retain the vehicle following the lien avoidance. Prior to the lien avoidance action, GMAC had been the only secured creditor in this case and the debtor had priority unsecured debts totaling $4,912.25 [1] when he filed the case. There are administrative claims in the case totaling $3,386.98.[2] The plan proposed by the debtor has a base of $7,930.78, and the debtor had paid the sum of $7,360.78 into the plan as of March 29, 2007, with two payments of $285.00 remaining to complete the 44 month proposed plan. The value created by the release of the lien on the vehicle is the sole non-exempt asset in this bankruptcy estate.

For reasons that remain unclear, the issue of the proper distribution of the recovered value did not surface, despite several post-lien-avoidance plan modifications first increasing and later decreasing the plan base,[3] until the debtor in this case filed a modified plan on April 5, 2007. The modified plan proposed to extend the plan

1. These were debts for taxes granted priority pursuant to 11 U.S.C. § 507(a)(8) and owed to the Illinois Department of Revenue in the amount of $890.00 (claim # 6–1) and to the Internal Revenue Service in the amount of $4,022.25 (claim # 10–1).

2. The administrative claims consist of attorney's fees of $2,200.00, the adversary filing fee of $150.00, and, according to the trustee, his chapter 13 trustee's fees of $1,036.98. The debtor estimates the chapter 13 trustee's fees to be $653.60 but admits that the trustee has a better grasp of the amount.

3. The debtor's original plan, confirmed on October 31, 2003, paid a minimal distribution to the general, unsecured creditors due to the Court, at that time, requiring that general unsecured creditors receive, at minimum, ten percent of their allowed claims. After GMAC's lien was avoided on February 9, 2004, it was not until August 11, 2004, that the trustee moved to increase the plan payments due to insufficient funding based on the claims that had been filed. This resulted in the debtor modifying the plan to increase its base to pay general unsecured creditors a substantial dividend totaling approximately $7,617.74. See Order of September 9, 2004 approving plan modification. Two further plan modifications, approved on June 1, 2005, and on March 29, 2006, respectively, decreased the plan base slightly. However, each modified plan still distributed more than $6,000.00 to the general unsecured creditors. This situation changed when the debtor filed another plan modification on October 13, 2006, decreasing the plan base substantially and making no distribution to the general unsecured creditors. This modification was approved on November 3, 2006, without objection from the trustee or any creditor. The debtor filed yet another modified plan on March 1, 2007, again providing no distribution to the general, unsecured creditors. The trustee was the sole objector to this plan, and his objection was based on internal inconsistencies in the plan with respect to its duration. The debtor agreed to modify the plan

duration from 39 months to 44 months with plan payments remaining static at $285.00 per month. This plan, like previous plans, conformed to the standard plan required in this District for cases filed prior to October 17, 2005, by proposing to pay the priority unsecured claims in full before distributing any funds to the general, unsecured creditors. This resulted in a proposed plan that made no distribution to the general unsecured creditors.[4] The chapter 13 trustee then objected to approval of the modified plan on the basis that this Court's decision in *In re Bell,* 194 B.R. 192, mandated that the unencumbered equity created by avoiding GMAC's lien must be distributed only to the general, unsecured creditors in order to prevent a windfall to the debtor who would be retaining the vehicle while no longer having to pay for it as a secured debt.[5] Under his reading of *Bell,* the trustee insists that the plan base must be increased to $13,999.23.[6] The debtor counters that

since he has already paid a substantial portion of the priority unsecured claims, and, in fact, more than the liquidation value of the vehicle, the trustee's interpretation of *Bell* would force him to pay twice for the liquidated value of the vehicle. The trustee does not oppose the proposed plan modification on any ground other than that described above.

■ Before reaching the central question raised by the parties, the Court must dispose of another matter. Both parties have devoted substantial effort to a recitation of the history of the changing plan base as the plan went through a series of post-confirmation modifications. However, counsel have presented no evidence to explain why the debtor increased the plan base to $16,380.00 effective September 9, 2004,[7] only to lower it to $7,765.78 on October 13, 2006, without objection from the trustee for nearly six more months.[8] The arguments of counsel do not constitute

again to cure this problem, resulting in the motion to modify that is now before the Court.

4. Since the plan proposed to pay $3,003.60 in administrative claims and $4,912.25 to the priority unsecured creditors before the general unsecured creditors would be paid anything, the proposed plan base of $7,930.78 would be nearly exhausted in paying the administrative claims and priority debts totaling $7,915.85, leaving only $14.93 remaining. As explained in note 2, *supra,* there is a discrepancy of $383.38 between the amount of the chapter 13 trustee's fees proposed to be paid in the plan and the amount that the trustee claims he is owed. The debtor states that the $14.93 was intended as a cushion due to fluctuations in the chapter 13 trustee's fees. Therefore, the $14.93 would be used to pay the trustee's higher than expected fees and the general unsecured creditors would receive no distribution under the proposed plan.

5. The trustee's objection, filed on April 10, 2007, stated:

On February 9, 2004, an Order was entered avoiding the lien on debtor's 2001 Chevy, with a value of $5,700.00. There-

fore, this amount must be paid to unsecured creditors. Plan payments must increase from $285.00 per month to $3,320.00 per month.

6. The trustee arrives at this figure by adding the $5,700.00 value of the unencumbered vehicle to the administrative costs of $3,386.98 and the priority claims of $4,912.25. The Court notes that a plan base of $13,999.23 would be substantially more than twice the value of the unencumbered vehicle.

7. It is not evident that the base increase was linked to the lien avoidance action since there is a gap of over six months between the February 9, 2004 lien avoidance and the trustee's efforts in August 2004 to obtain an increase in plan payments. See *supra* note 3.

8. The trustee states that "[d]ue to inadvertence and/or oversight," he failed to raise the issue at hand with respect to the plans filed October 13, 2006, and March 1, 2007, both of which decreased the plan base substantially and offered no distribution to the general unsecured creditors. The Court is troubled that the trustee now raises this issue which

evidence. Nonetheless, the Court finds the plan's history to be irrelevant to the question of whether the current modification should be approved. That question must be determined by examining whether the current version of the plan stands or falls on its own merits when measured against the standards for post-confirmation plan modification found in 11 U.S.C. § 1329 (2000) (prior to 2005 amendment).[9]

Section 1329 of the Bankruptcy Code provides, in pertinent part:

> (a) At any time after confirmation of the plan but before the completion of payments under such plan, the plan may be modified, upon request of the debtor ... to—
>
> . . . .
>
> (2) extend or reduce the time for such payments. . . . [10]
>
> . . . .
>
> (b)(1) Sections 1322(a), 1322(b), and 1323(c) of this title and the requirements of section 1325(a) of this title apply to any modification under subsection (a) of this section.
>
> (2) The plan as modified becomes the plan unless, after notice and a hearing, such modification is disapproved.

11 U.S.C. § 1329. Of the sections referenced in § 1329(b)(1), only §§ 1322(a)(2) and 1325(a)(4) are directly applicable to the arguments in the instant case.

Section 1322(a)(2) requires a modified plan to provide that all priority unsecured claims will be paid in full, unless the holder of a particular claim agrees to a different treatment. The section states:

> (a) The plan shall—
>
> . . . .
>
> (2) **provide for the full payment,** in deferred cash payments, **of all claims entitled to priority** under section 507 of this title, unless the holder of a particular claim agrees to a different treatment of such claim. . . .

11 U.S.C. § 1322(a)(2) (emphasis added). The modified plan at issue in the instant case is the standard plan required to be used in this District for cases filed prior to October 17, 2005.[11] The modified plan, following the provisions of the standard plan, complies with § 1322(a)(2) by providing that the trustee "will pay 100% of all claims entitled to priority under 11 U.S.C. Sec. 507. . . ."[12] Here, the trustee has not

should have been raised as an objection to the October 13, 2006 plan modification. However, since the debtor has not argued issue preclusion, the Court will not examine the impact of the trustee's failure to object to this issue when it first arose. *See, e.g.,* 8 *Collier on Bankruptcy* ¶ 1329.02, at 1329–5 (15th ed. rev.2007).

9. Because this case was filed on September 29, 2003, the amendments enacted by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 are not applicable. Hereafter, all references to the Bankruptcy Code, 11 U.S.C. § 101 et seq., will be to the version of the statute in effect when the instant bankruptcy case was filed.

10. As noted previously, the proposed modification increases the plan duration but does not change the monthly payment amount.

11. The instructions for use of the standard plan state that "[c]onsumer debtors are expected to use this standard plan unless a motion is filed to show cause why the use of another plan should be allowed. . . . Additional provisions not provided for in the form may be added where circumstances warrant, except that, unless otherwise provided in these instructions, such additional provisions may modify existing provisions only if the debtor first obtains leave of court." See Chapter 13 Plan Instructions for cases filed before October 17, 2005, http://www.ilsb.uscourts.gov/procforms.shtm.

12. Section III(H) of the modified plan enumerates the priority claims as those of the Internal Revenue Service and the Illinois Department of Revenue. See *supra* note 1.

disputed that the two tax claims are entitled to priority treatment under 11 U.S.C. § 507(a)(8). Thus, without more, the modified plan meets the requirements of § 1322(a)(2) and cannot be defeated on this basis.

▉▉ However, the modified plan does say more about the treatment of priority unsecured claims. In conformity with the standard plan, it provides that priority unsecured claims are to be paid prior to general unsecured claims.[13] Although the Bankruptcy Code, 11 U.S.C. § 1322(b)(4),[14] does not require that priority claims, other than fees and administrative expenses, 11 U.S.C. § 1326(b), "be paid temporally in the prescribed order of priority or in advance of unsecured claims generally," 8 *Collier on Bankruptcy, supra,* at ¶ 1322.03[2], at 1322–12 to 13, such treatment is mandated by the standard plan and is not prohibited under the Bankruptcy Code. *See id.* at 1322–13 ("debtors usually wish to pay priority claims in advance of other unsecured claims"). When read in concert, the standard plan filed by the debtor, and § 1322(a)(2), demand that the priority unsecured creditors be paid in full before the general unsecured creditors receive any distribution under the plan. However, since the chapter 13 trustee's fees in this case exceed what the debtor has allotted for them in the modified plan, the claims of the priority unsecured creditors will not be paid in full under the plan as proposed. This is because the proposed

plan base of $7,930.78 is insufficient to cover in full the administrative expenses of $3,386.98 and the priority unsecured claims of $4,912.25. Therefore, were the Court to accede to the trustee's argument—by allowing exclusive payment to the general unsecured creditors from the vehicle's unencumbered value while the priority creditors remain partially unpaid—this would violate § 1322(a)(2) and the terms of the standard plan, which the debtor was required to use in modifying his plan. The trustee's notion that this problem can be eliminated by the requirement that debtor fully fund all administrative and priority claims and then pay $5700.00 to the general unsecured creditors, is dispelled by the liquidation analysis to follow. The debtor, nonetheless, must propose a modified plan that pays the priority unsecured creditors in full.

▉▉ The other referenced section applicable to the arguments raised by the parties is § 1325(a)(4), commonly known as the "best interests of creditors test," which states that:

(a) [e]xcept as provided in subsection (b), the court shall confirm a plan if—

. . . .

(4) the value, as of the effective date of the plan, of property to be distributed under the plan on account of each allowed unsecured claim is not less than the amount that would be paid on such claim if the estate of the

---

13. The introductory paragraph to section III of the modified plan, like the standard plan, states that "[f]rom the payments received from debtor(s), the Trustee shall make disbursements in the following order...." That order places priority claims ahead of general unsecured claims for payment and provides that general unsecured creditors will "share in pro-rata distribution of all remaining funds." *Compare* section III (introduction, H, and J) of modified plan filed on April 5, 2007 *with* the same provisions of the Chapter 13 plan for use in cases filed before October 17, 2005, http://www.ilsb.uscourts.gov/procforms.shtm.

14. This section provides in pertinent part that "the plan may ... provide for payments on any unsecured claim to be made concurrently with payments on any secured claim or any other unsecured claim." 11 U.S.C. § 1322(b)(4). *See also* 8 *Collier on Bankruptcy, supra,* ¶ 1322.08, at 1322–33 (footnote omitted) ("priority claims are not entitled to payment in advance of other unsecured claims as a matter of right").

debtor were liquidated under chapter 7 of this title on such date.

11 U.S.C. § 1325(a)(4). Assuming all other criteria for plan modification are met, pursuant to this section the Court is required to approve a modified plan if it provides a distribution to the general unsecured creditors that is not less than they would have received had the case been liquidated under chapter 7. To arrive at a liquidation value to be paid the general unsecured creditors, the Court is to calculate the value of all nonexempt property of the estate, reduced by the administrative expenses that would be incurred in a chapter 7 case,[15] by the amount of all lien claims that would be enforceable against the property under chapter 7,[16] and by the amount attributable to priority unsecured claims allowed under chapter 7. *E.g., In re Wilheim,* 29 B.R. at 913; 8 *Collier on Bankruptcy, supra,* ¶ 1325.05[2][d], at 1325–21 to 22; 9D *Am.Jur.*2d Bankruptcy, *supra, at* § 3119. *See also* 11 U.S.C. § 726(a) (property of a chapter 7 estate is distributed first in payment of administrative and priority claims of the kind specified in, and in the order specified in, § 507, and thereafter in payment of other allowed unsecured claims).

■ Calculation of liquidation value in this case is a simple matter. Were the estate to be liquidated under chapter 7, it is agreed that the sole non-exempt asset would be the equity of $5,700.00 realized

through the lien avoidance action. However, the general unsecured creditors would not receive this amount in a chapter 7 case. The value of the asset would be reduced by the sum of $684.00 to account for the 12 percent costs of liquidation incurred by a chapter 7 trustee, by the $150.00 adversary filing fee paid by a chapter 7 trustee to avoid GMAC's lien, and by the sum of $4,912.25 that a chapter 7 trustee would pay to the priority unsecured creditors. Based on this calculation,[17] demonstrating that the debtor's general unsecured creditors in a hypothetical chapter 7 case would receive no distribution, the modified chapter 13 plan proposed by the debtor satisfies the best interests of creditors test. Although it pays nothing to the general unsecured creditors, it cannot be disapproved on this basis.

■ However, the chapter 13 trustee is dissatisfied with such a result. He believes that the sum of $5,700.00 must be added to the existing plan base and distributed exclusively to the general unsecured creditors. The crux of his argument is based on the following passage from the *Bell* decision:

[A]lthough the debtors in these Chapter 13 cases will retain the subject vehicles following bankruptcy, they will have 'purchased' them by paying into the plan an amount of money equal to their value

---

**15.** 8 *Collier on Bankruptcy, supra,* ¶ 1325.05[2][d], at 1325–21. These expenses would include costs of sale by the chapter 7 trustee, trustee's fees and other expenses that would be incurred in a chapter 7 liquidation of the property. *Id.* at 1325–21 & n. 27; 5 Norton Bankr.L. & Prac.2d § 122:7 (2007); 9D Am.Jur.2d *Bankruptcy* § 3119 (2007) The chapter 13 trustees in this District subtract 12 percent of an asset's value to account for the hypothetical chapter 7 trustee's costs in selling the item and for the chapter 7 trustee's statutory fees. The debtor has not contested using this methodology.

**16.** *E.g., In re Wilheim,* 29 B.R. 912, 913 (Bankr.D.N.J.1983); 8 *Collier on Bankruptcy, supra,* ¶ 1325.05[2][d], at 1325–21 to 22; 9D *Am.Jur.*2d Bankruptcy, *supra, at* § 3119. As noted earlier, there are no lien claims to be paid in this case other than the GMAC lien, which would be avoided by a chapter 7 trustee.

**17.** The calculation is as follows: $5,700.00– ($684.00 + $150.00 + $4,912.25) =-$46.25.

as of the effective date of the plan. This amount will be distributed among unsecured creditors of the estate, including the defendant creditors who will receive a substantial portion of their now unsecured claims. While the creditors in these cases, by not perfecting their liens, have forfeited their preferred position in the distribution of plan payments, no windfall results to the debtors, who must pay into the plan as much as if the subject vehicles were liquidated for the benefit of estate creditors in a Chapter 7 case.

*In re Bell*, 194 B.R. at 198. The trustee interprets this language to mean that only general, unsecured creditors are entitled to benefit when an asset becomes unencumbered through a lien avoidance action. In addition, the trustee contends that the plan base must be increased by the value of the asset without reference to the constraints that the best interests of creditors test places on what may be expected of a debtor. The Court finds neither argument to be of merit.

 In the first instance, the *Bell* decision did not examine competition between groups of unsecured creditors [18] over entitlement to funds of the estate. There was no discussion whatsoever in the opinion about the rights of priority unsecured creditors and, in fact, there is no evidence before the Court showing that priority claims were present in the cases consolidated in the *Bell* decision. Since *Bell* never addressed the issue at hand, it is of little persuasion in advancing the trustee's argument. Nonetheless, the trustee has relied exclusively on the cited passage to support his position and has provided the Court with no other authority to bolster his argument. Nor has the

Court found any authority to support the trustee's notion that priority unsecured creditors may not share in any distribution realized when an asset becomes unencumbered through a lien avoidance action. As the Court explained in *Bell*, when a lien is avoided, the former lienholder's interest in the debtor's property becomes estate property and merges with any residual interest held by the debtor which passed to the estate upon commencement of the case. *In re Bell*, 194 B.R. at 197–8. If a debtor wishes to retain the previously encumbered asset, he must "purchase" it from the estate by paying the value of the asset into the plan where it will be distributed in accordance with the terms of the Bankruptcy Code and the standard plan. In this case, the $5,700.00 value released by the lien avoidance is the sole non-exempt asset of the estate and the debtor has already paid more than this sum into the plan. The fact that, in this case, the funds have been exhausted in paying the administrative and priority claims simply is a sad reality for the general unsecured creditors based on the mathematics of the case.

 In addition, the trustee has been able to discount the relevance of liquidation analysis to the issue at hand, only by taking the cited passage from *Bell* out of context. The *Bell* decision was concerned with the ability of a chapter 13 trustee to avoid an unperfected security interest in a vehicle despite acts of a debtor that had contributed to the unperfected status of the lien creditor. The decision further detailed the aftermath of lien avoidance: "the avoided lien ... is preserved for the benefit of the estate," 194 B.R. at 197, "[t]he former lienholder's interest in the debtor's property automati-

---

**18.** The reference to "unsecured creditors" in the passage cited by the trustee does not necessarily exclude priority unsecured creditors since, with the exception of administrative claimants, all claimants entitled to priority treatment under § 507 are **unsecured** creditors. 11 U.S.C. § 507.

cally becomes property of the estate," *id.* at 197–98, and, upon confirmation, the debtor "acquires his previously encumbered asset free and clear of the avoided lien—subject only to reinstatement of the lien if the case is dismissed prior to the debtor's discharge." *Id.* at 198. In conveying to the aggrieved lien creditors that all was not lost as a result of application of these principles—**and as a preamble to the passage cited by the trustee**—the Court in *Bell* explained:

> Application of these principles in each of the present cases results in the debtor obtaining a vehicle free of the lien granted to secure its purchase price, while paying the creditor only a portion of its claim as an unsecured creditor under the debtor's Chapter 13 plan. The creditors term this result an 'abuse' of the bankruptcy process.... Nevertheless, the Bankruptcy Code does not leave these creditors without protection. Rather, as one of the provisions designed to safeguard the rights of chapter 13 creditors, the Code assures that unsecured creditors in a Chapter 13 case will receive at least as much as they would have received if the estate were liquidated under chapter 7. This provision, known as the 'best interests of creditors' test, essentially requires the debtor to pay for his non-exempt assets over the term of the plan.

*Id.* (citations and footnote omitted). When read in context—with the passage cited by the trustee directly following the quoted preamble to that passage—the Bell decision expressly states that the best interests of creditors test applies in determining the amount that the unsecured creditors are entitled to receive following lien avoidance. *Id. See also In re Hearn,* 337 B.R. 603, 615–16 (Bankr.E.D.Mich. 2006) (creditors have right to insist that

the value of an avoided lien be made available to them under the debtor's plan to satisfy the best interests of creditors test). Therefore, contrary to the trustee's seeming notion that Bell fashioned a unique remedy, unbounded by the limitations of liquidation analysis, for those situations in which the errant conduct of a debtor contributed to the unperfected status of a lien, the decision merely reiterates what is provided by statute. 11 U.S.C. § 1325(a)(4). The Court agrees that the debtor would be subject to "double payment" were he required to pay the value of the vehicle into the plan without crediting amounts being paid to administrative and priority unsecured claims. To hold otherwise would violate 11 U.S.C. § 1325(a)(4) by enabling the general unsecured creditors to receive far more than they would have received had the lien been avoided and the vehicle liquidated by a chapter 7 trustee. While it may appear that the debtor in this chapter 13 case is reaping a windfall because, in contrast to a chapter 7 debtor, he is able to retain the vehicle free of the lien, this is not the case. The debtor has "purchased" the vehicle by paying more than its $5,700.00 value into the plan. *See In re Brennan,* 208 B.R. 448, 450 (Bankr.S.D.Ill.1997); *In re Bell,* 194 B.R. at 198. Indeed, while the trustee zealously strives to protect the interests of the general unsecured creditors, the detriment in this case falls not on the general unsecured creditors en masse, but only on the former lienholder, GMAC. The general unsecured creditors received no benefit from the vehicle when it was subject to GMAC's lien and, upon lien avoidance, are receiving as much as if the vehicle had been liquidated.

Based on the foregoing, the trustee's objection to the modified plan is overruled.[19] However, the debtor will be or-

---

19. Because the debtor has prevailed on the merits, the Court need not address the debt-

or's argument that the trustee lacked standing to avoid GMAC's lien.

dered to further modify the plan in order to pay the priority unsecured claims in full.

SEE WRITTEN ORDER.